Good morning, everyone. Today, we're going to be looking at the T-10438, United States versus Igor Grushko and Dennis Grushko. So, Ms. Foldes, you're going to take 11 and then save 4 for rebuttal? That's correct, your honor. Right, and Mr. White, you've got 3 and then 2 on the rebuttal side. Okay, and Mr. Dion, you've got the full 20 on behalf of the government. Okay, Ms. Foldes, whenever you're ready. Good morning, and may it please the court, Margaret Foldes, Assistant Federal Public Defender on behalf of Dennis Grushko. This morning, I will be addressing the Fourth Amendment issue, which is governed under the de novo standard of review under this court's decision of United States versus Magluta. I would also like to address the error in the loss calculation and discuss its harmfulness. And for all other issues, I'd like to rely on my briefs unless there's other questions. Under Payton versus New York and United States versus Magluta, an arrest warrant does not permit agents to enter or search a house unless the agents have an objectively reasonable belief that the person they're trying to arrest is in that house at that time. Under United States versus Magluta, it's very clear that the standard of review is de novo. As a matter of fact, Magluta says that there is no doubt about the de novo standard for a review of an officer's probable cause, which is similar to the reasonable belief standard determination. And the underlying reason for that is because in these types of situations, the first parties that are on the scene are the police officers. They are the first ones that make that probable cause or reasonable belief determination. And so the reviewing court has to take a more substantive look at how to make their decision. Let me just sort of drill into that point for a moment. I think that's clearly right that we have to review de novo the probable cause determination. But we are required, are we not, to accept the credibility findings of the trial judge unless they're clearly erroneous. The reason I ask is, of course, because in this case, I think the trial judge credited the testimony of the case agent, I think it was Workman, in his account, that he believed A, B, C, and D, which was said by Workman. We're obliged to accept that unless that's clear error, right? Unless it's clear error, yes. But that's one piece of this. I agree that doesn't dispose of the legal question of probable cause. If you will, it is a building block that might go into that ultimate determination. Right. And for purposes of this argument, we can take that credibility determination and accept it. Okay. So for that purpose, we will say that Agent Workman was credible. And because even if he had a subjective belief that Mr. Igor was in the house, that still does not meet the standard here. Because the standard is not what that agent thought, that specific agent thought. The standard here is what a reasonable belief would be for a reasonable agent going into that house based on the arrest warrant. And under the undisputed facts in this case, there could not have been a reasonable belief. First of all, the agent had been investigating these people for a year. He had seen many, many pictures of Igor. And he had even seen video feeds of Igor. And in the record at the suppression hearing, it was defendant's exhibit number four, there is a smattering of pictures. And this is just a small smattering of pictures of Igor with different hairstyles, a beard, everything. That is what the case agent had and saw over the course of a year. That's defendant's exhibit four to the suppression motion. It's also in the government's appendix, page 132. And it's also a smaller version of it is in my reply brief on page nine. I mean, I'm looking at that exhibit, Ms. Foldes. And I could see how you could make an argument one way or the other about likeness and ability to figure out that the person in one photograph was a person in another photograph. But I'm not sure that's the only way to look at all those different photographs. In some of them, Mr. Grushko has a beard. In some of them, he has longer hair. In some of them, he has more cropped hair. And in some, there's a combination of the two. So why is the district court's decision about objective reasonableness wrong? Because the agent who was doing this investigation is the one who would, you know, the agents are the ones who are the people have to come up with, at least in the first instance, whether there's a reasonable belief. And so having all this pictures showing Igor in all these different scenarios with these different hairs and the beard and everything shows the range of what he can look like. But when they actually set up for the arrest, the execution of the arrest warrant, they had a picture from the Florida driver's license which showed his facial features very clearly, his eyes, his cheekbones, his nose, and those don't change. And that's exactly what the agent said is why he picked this picture. And all of these pictures, all of this knowledge is imputed to the entire arrest team. So when they're on the scene, they have all of this information and the agent was there, he was interacting with the defendants after having investigated them for a year. And in addition, it's not even just the picture of this person, but it's also the circumstances about the arrest. When they went there, they went to the defendant's home. It was the exact address of their home. They knew that the two brothers lived at this home. And they went there at six in the morning, which is standard procedure. It's in a gated community, so there's not a big inflow of non-residents entering and leaving this community. It's six in the morning, and when they get there, they find, what they're looking for, two men at this house who live there. And when they arrive, they actually see two men standing a few feet in front of the front door of this. But counsel, the problem is, in my view, you have a finding from the district court of paragraph 109 that Agent Workman credibly testified that Igor Grushko was unable to be identified despite the photographs Agent Workman had previously seen of him due to his changed appearance at the time of the arrest operation, the fact that Agent Workman had never seen Igor Grushko in person before, and Igor Grushko's refusal to identify himself, although he spoke English. And it seems to me that all of these facts that you're talking about would require us to ignore this credibility determination or find that it's clearly erroneous. Am I wrong about that? The credibility determination is not what controls. What controls is a reasonable person looking at the situation and seeing that we're in a gated community at 6 in the morning and there's two guys standing in front of the exact address where they live, smoking cigarettes at 6 in the morning. Like, who else is going to be a few feet in front of their front door? And they fit the description of who the agents are looking for. And when they get out of the car, you know, they don't go up and say, are you guys the Grushkos? They run out of the car. They say, hands up, hands up, get down on the ground, get down on the ground. They throw them down on the ground. They put them in handcuffs. They put them prone on the ground. They fracture Dennis's rib. So they're using a lot of force. It's a very aggressive thing. For them to go through all of that and then within five minutes, they have the wallets of both the Grushkos. In the wallets are their identification. If they had any questions. Let me ask you a question about that. To the extent they were detained at the time, the agents would have been free to pat them down, to search for a dangerous weapon. Would they have been lawfully authorized to go into the wallet and take out something in the wallet in order to ascertain who they were when these folks said, we're not answering your questions. We're not telling you who we are. Could they go into the wallet? Well, it depends if you believe that they were under custodial arrest or not. Correct. Okay. So in my brief, I have a couple of different things. One is the aggressive use of force and the way that they were handcuffed in line prone face down on the ground in front of this house indicates custody. Also, when people don't identify themselves, there are basis for arrest just on that basis for interfering with the execution. But that's not what worked and said. Workman's testimony includes the statement that they were being detained and the magistrate judge, as I pointed out, and as Judge Pryor pointed out, credited the testimony of Agent Workman. He said, basically, as far as he was concerned, they were being detained in order to ascertain whether they were the folks named in the arrest warrant. In the transcript, Agent Workman actually said six times he referred to this. Four out of the six times he said they were in custody. Two times, once he corrected himself in the middle of the sentence, whatever. But I don't want to get hung up on that. If he's not in custody, that's not the ultimate issue. The ultimate issue is would there be random people standing a few feet in front of this door in this gated community at six in the morning, smoking cigarettes that match the description and they're not the people who live there? That's really the ultimate question. For the team of people going there. Let me ask you. You're saying we decide that issue de novo? Yes. With no deference whatsoever to the testimony on the ground? I mean, you have to, I think you had said earlier, and I think correctly, that the ultimate legal question is reviewed de novo, it's a plenary standard. But you take into account what the facts were on the ground based on the factual findings of the district judge or the magistrate judge, right? That's correct. But under these circumstances, again, the circumstances are who else is going to be in front of that house at that time of the day? And if the agents were, you know, they went back and asked what is the- How do you discount the possibility of a guest in the home? I mean, if you're talking probabilities, I get your point. That is what I was going to say, is this is not 100% certainty. This is probabilities. And the most likely scenario of what the facts were showing at that time, at six in the morning in that gated community, is that the two people that live in that house were the ones who were a few feet in front of their front door smoking a cigarette. That is the most likely scenario and the most likely scenario. And the most likely conclusion you can draw from that. I take your point up to a certain extent that that is a possibility. And the difficult question is whether or not that is the probability or the most likely possibility. I'm not sure. Well, I would submit, Your Honor, that it is under the circumstances looking at that kind of scenario, it is the, you know, the highest probability of what was the situation. So that is what we're arguing. Let me just ask you, and really, Your Honor, our time now, not yours. Ms. Foldis, I have just two additional facts that came out. And I want you to tell me how they bear upon the reasonableness of the belief. First, apparently there was a third defendant whom they had been looking for named in the arrest warrant of Vadim Vazniak. And the agents testified they were uncertain of his current address. He had lived next door for a while. They didn't think he was living there anymore. But they were concerned that possibly one of the two was Vazniak. And the second factual observation made by Workman was that the agents heard noises coming from inside of the home, after all, it was real early in the morning, supporting the belief that one of the men listed in the arrest warrant may actually have been inside the house. Those were two other additional extrinsic facts. Did they not bear upon the reasonableness of the belief? With respect to Mr. Vazniak, Agent Workman said that they didn't believe he was there anymore, that he was out on Miami Beach. They actually sent a whole other crew out there to figure out if he was there, as opposed to, you know, at this location. So they sent a whole crew just to look for Mr. Vazniak out on Miami Beach, a whole different place. So they were not expecting him to be there, and that's not what they were thinking. With respect to the voices, there was a chronology that happened here. First, they had everybody laying face down on the ground before they ever went to the door. So my first argument is that they didn't have a reason to go to the door in the first place because they had already executed those arrest warrants. They already had people in handcuffs, two of them, that matched the description of those arrest warrants. But the second thing is, when they did go up to the door, they went up there and they saw there was a deadbolt and a combination lock. So what did they do? They went back to the defendants who lived there, and they said, what's the combination to your door? And they didn't get a response, so that's when they started trying to knock down the door with the battering ram. Before they got to the battering ram part, though, they said they knocked and announced. They waited a reasonable amount of time. And in the transcript, you'll see that they're talking about they had a certain formation. Not everybody could hear a noise because they had the hurricane windows and doors and things. So the person who was at the front of the formation was leaning in, trying to hear noise. And we know because they did breach the door, there weren't people, there weren't voices, plural. So whatever they heard is very unclear about that. But even if you credit the voices, the only person in that house was a woman's voice. So hearing a woman's voice would not give a reasonable belief that a man, Igor, is in the house. So for those reasons, I don't think- Let me ask you, wasn't the testimony that, quote, what if anything did you learn from the agents who knocked and announced what they heard inside the house, anything? They heard voices, was put in the plural, and noise. Did I get that right? That's accurate. But when they breached the door, right, there was one person in there and it was a woman. Once they went in, once they got inside, they found one person, a woman, unrelated. But I'm simply asking, did they not say that they heard more than one voice from the outside? That is the testimony. And all I'm saying is, if they heard the voices, okay, it would have been a woman's voice, which would not give a reasonable belief that a man, being Igor, was in the house. Got it. Thank you. Thank you. Thank you, Ms. Foldis. You saved your full time for rebuttal. May it please the court, Charles White, on behalf of Igor Grushko, I want to start off by apologizing for being late. I appreciate the court accommodating my hardiness by moving the arguments around. Not a problem. I'm adopting, on behalf of Igor Grushko, the arguments that were made by Margaret Folder. I don't know if you need me to address the Fourth Amendment issue. I was going to focus more on the sentencing. You have a limited amount of time, Mr. White, so you decide what to focus on. And everything that you and Ms. Foldis have raised in your briefs is preserved. You're not going to get to everything. So you decide how to... I would like to address the Keene issue, which has been raised by the government in rebuttal. We had a situation where the government has conceded that the relevant conduct, amount of loss calculation that was made by the district court was erroneous. Erroneous by a lot. Probably anywhere from eight to seven levels, which would result in a substantial variance in the sentence. What the government says is because, and particularly in this case, where when they asked the district court to give a reason whether she would make a finding under Keene, she cited exactly the number of access devices that the government couldn't prove at the evidentiary hearing were, in fact, could be counted as relevant conduct. And they also have cited the Proctor case on pretty much the same basic principle. And I suggest to the court that the factors that are inherent in 3553 that the government is citing to justify these upward variances, which is what they really are, are contrary to the principles of the guidelines and the right of the defendant and the government to be sentenced under the guidelines. Let me ask the question this way. Let's accept for the purpose of my question that the district court made a mistake. Government concedes the mistake was made more than one. I think there were at least two clear mistakes the trial judge made in sentencing. But in the course of the colloquy, the government asked the judge to make a finding under Keene to the effect that even if he had made a mistake in calculating the guidelines, it would not have made any difference. That is to say, even if he had agreed with the defendants rather than the government and the probation department, he would have imposed exactly the same sentence. That's what Keene says a judge can do. If indeed that was the case, wouldn't any error here be purely harmless? No, Your Honor, because the point  and the government has the burden of proof, if they don't meet their burden of proof as they did not in this case, then you have a lower guideline level. The court at the time was not considering in this case whether that guideline level might be wrong, that the government hadn't proven that there were over 1,000 access devices. Yet what she said was, I don't care if the government could prove it or not, I'm going to sentence them as if it was proven, which is exactly contrary to what the district court is supposed to do after Booker. They're supposed to determine the guideline. Well, isn't the question though, and maybe I've got it wrong, so help me understand this. The judge made reference to 1,000. In fact, there were something in the neighborhood of 300, right? That was the claim that was made. The judge said, whether I made a mistake or not about that, I would still impose the same sentence. Here are some of the 3553 factors considered. He didn't say it quite that way, but that I think is the gist of it. Why isn't that enough to make any mistake or error harmless under Keene? What Keene says is, we're not going to go through the useless exercise of sending it back to get the judge to correct a guideline error where the judge tells us he would impose the same sentence anyway, and where that sentence was substantively reasonable. So if it was substantively reasonable to do it, we're not sending it back. Tell me why that's not what we have here. Because in this case, when the government is in essence asking for an upward variance, they're asking for it based not on other circumstances in the case, but the very circumstances that they failed to prove its sentencing. And this is the problem when you use the 3553 criteria of the circumstances of the case as a substitute for the burden that's on the government to prove those enhancements. Your position on that point is that if the government has the burden of proof on a guideline issue and fails to sustain that burden of proof on that issue, the district court cannot base a variance based on the existence of that guideline issue as if it had been proven. Correct. Absolutely. I think that we've gone far. Originally as a practitioner, before and after the guidelines, when 3553 came out, it was a reason to go below the guidelines based on some of the criteria that were in chapter five that were not enough to get a downward variance. And we would litigate all those issues. Now we have this evolution where 3553 is used to increase the sentence above. Pandora's box has been opened. Yes, Your Honor. I think the court should close it. The question though, and you might be right about that, but it seems to me this panel is bound by Keene. And if you're right, what's left of Keene? That the court would have to come up with another reason for an upward variance other than the issue that they failed to appear. For instance, there was an allegation made that there were two points added for obstruction of justice. I'm not going to argue with the substantive point, but let's say for instance that it turned out that that was re-objected. And let's say that this court decided that there was no obstruction of justice. Could the court say, well, I thought there was obstruction of justice. I said the same. All of these objections could have been sustained by this court. And then you go back and you say, well, the judge said it was all harmless error. Mr. White, last question before you sit. Do you agree that taking the district court's mistakes into account, what we are looking at at the end of the day is a 57-month variance? Yes. Right. Because the government says that it would have been 51 to 63 and you seem to agree with that. Yes, Your Honor. Right. And then you tack on the 24 and then you get 57 months from the top of that range to the sentence ultimately imposed. Yes. Okay. Let me just follow up on that. Accepting that there was a 57-month variance here, would that as a matter of law make the sentence substantively unreasonable? Because they've got to show if they want Keene to apply, not only that the judge said, even if I made a mistake, I'd have done the same thing. They have the additional burden of showing that what the judge did was substantively reasonable. I'm asking you under the law whether a 57-month variance of this sentence upward makes as a matter of law the sentence the district court imposed substantively unreasonable. And if the answer is yes, tell me why. Or if your answer is maybe it's not, but Keene ought not to be applied, that would be a somewhat different argument. Do you follow what I'm asking? I think that it would be. I would say yes. I'm arguing from this side. I think the question for the court is that if you don't require the district court to articulate grounds other than the ones that the government failed to prove as a reason to enhance, to do an upward variance or to enhance the sentence, then you're inviting, then you have to draw a line. Is it 20%? Is it 30%? Is it 40%? And I think that that arbitrary line drawing is going to be a problem. I think it's much easier to just look at what was the reason why the court justified the sentence. And if the reason that the court justified the sentence was based on the fact that it believed that the government had proven its case, so to speak, then that's improper. And that would be substantively unreasonable. Thank you very much. Thank you, Your Honor. Thank you. Mr. Dionne. Good morning, Your Honors. May it please the court. Scott Dionne on behalf of the United States. I'd like to begin by- We're talking, let's to talk about the last point first so that you can then move on to the other issues. That 57 month variance is a 67% variance, right? I just did a quick math. I think I got it right, but- It's been a long time since I've done math, but I trust your math, Your Honor. That's not a trust you should put too much confidence in, but it's 80, it's- That's why we all went to law school. If you're going, but if you're going, if you're going 84 to 145, if you double 88, if you- It's over 60%. I may have the second digit off, but it's over 60% variance, right? I'm trying to do the math in my head, and I think that that sounds right, Your Honor. Okay, so tell me why that is substantively reasonable. Because that's, if we apply, if we apply our cases, what we have to look at, if the judge says, no matter how many mistakes I might have made, I'm imposing the same sentence, then we have to look to see whether or not that alternative sentence is substantively reasonable, right? Correct. Right, because if it isn't, like think of a scenario where if the defendant is right about everything on the guidelines, the sentencing range is 10 to 16 months. If the government is right about everything, the range is 144 to 160 months. Right. So that's district court, district court sides with the government on everything, says 144 to 160. Turns out the defendant is right about everything, and it should have been 10 to 16. And the judge says, I would have imposed the same sentence of 160, no matter what. And you're talking about a hundredfold increase. You have to look at substantive reasonableness. Correct, yeah. And that's the limiting principle on Keene. And in general, to look at substantive reasonableness, we ask if the court failed to afford consideration to relevant factors, do significant weight. The answer here I would say is no. The court looked at the Gruszko brothers, the nature of their conduct, the fact that this was such a widespread fraud, their failure to show remorse. And the second factor would be if they gave significant weight to an improper or irrelevant factor. Again, I'd say the answer to that is no. Well, Mr. White says in that regard, in part, that one of the things that district court did was sort of double down on the government's failure of proof with regard to the number of access devices involved. And he says you can't double dip if you made a mistake. You can't then double down on the mistake and use that as a reason to uphold a variance. What's your response to that? In that regard, Your Honor, I believe there's a slight distinction there. The court actually described it as 1,000 victims and not 1,000 access devices. I do think that there was. But there weren't 1,000 victims. Well, there were. The government proved or had testimony to the effect that there were 1,000 access devices or numbers or other numbers or identifiers of persons. They failed to meet their burden or the district court, I should say, failed to make factual findings as to whether each of those 1,000 numbers constituted an access device. But the fact remains that there were hundreds, if not 1,000 of numbers, identifiers, perhaps those other numbers, as Agent Workman put it, didn't legally qualify as unauthorized access devices, but they still qualify as identifiers of victims that the Grushkos didn't know. This was all stolen identity. I take it it would be clear that there were at least 300. Correct, yes. At trial, there was testimony that there were 400 access devices found, unauthorized access devices found, or greater than 400, I should say, and those were described as credit cards, CVVs, social security numbers, etc. The distinction, of course, at sentencing was that Agent Workman added testimony that there were other numbers or other means to identify victims without expanding on that testimony. So again, like Your Honor said, the limiting principle here is substantive reasonableness. Whatever the guidelines range is, we know what would happen on remand. The judge, Judge Smith, made it clear. He said, whether I made a mistake or not, this is the sentence. If you remand this because of the procedural error or if there's multiple procedural errors, he's going to impose the same sentence. It's going to come back on appeal and the question will be whether that sentence is substantively reasonable. And so the question, to skip that, all that unnecessary back and forth, the question under Keen is whether this sentence, accepting that there is an error, this sentence is substantively reasonable and we'd say, no, Your Honor. And I'd add one final point to that. Keen actually says that the burden to prove substantive reasonableness, or unreasonableness, I should say, lies with the defendant. And that's even in the case of a Keen finding. I know that the defendants have made a substantive reasonableness argument, even accepting all the guidelines, but I want to make it clear that it's the defendant's burden in the end to prove substantive unreasonableness. Now, if they're right about the other guideline issues, the substantive reasonableness become a closer call. So in other words, if the guidelines should have been 24 to 36 and he goes up to 145, does the calculus change? Your Honor, I did the math on that one. I did. So I can give you what I think would be the exact offense level if we accept all of the errors, apart from one, which I believe is just not a correct challenge, which would be the device making equipment. I so accepting, in other words, their challenge to the aggravating role, their challenge to the loss amount, their challenge to the other two point enhancement that's escaping me right now, the offense level, aggravating role, the offense level would be 22 and with a criminal history point of one that would lead to a guidelines range of 41 to 51 months. And so, and again, not the best of math, but perhaps my math is wrong here, but that would be a 70 month variance because the ultimate sentence was 145 months. So even accepting all of their issues as, I'm sorry, all of their challenges, except of course, the double counting issue, even accepting all of those issues as correct, that would lead to only a 70 month variance. And again, we believe a 70 month variance in this case is substantively reasonable and that's the limiting principle on Keene. We know what would happen if this went back on remand, even if we accept every single one of these as an issue apart again from the double counting issue, which I think just has no merit whatsoever. It would just be a 70 month variance and that's what would be reviewed here. All right. Let's turn to the fourth amendment issue. Ms. Foldy says in part that objectively, even accepting the factual findings made by the magistrate judge in the district court, they knew who they had when they got them on the ground and that there was no reason at that point, no objectively reasonable basis to go into the house. So your response? My response would be this is, again, they win the day if they can prove clear error, but that's not. No, no, but no, no, but I'm, yes, but I'm telling you that she's, her argument is in part, except every factual finding made by the magistrate judge as a matter of law, they did not have a reasonably objective basis. The question is not whether Workman had a subjective. Right decision that he didn't know who it was. The question is whether or not on an objective standard, they could have gone into the house and her position is take all the factual findings, accept them all. We still win. And your response to that is what? Yeah, my response would be accepting the factual findings which would mean that the agents did not identify one of the targets of the arrest warrant, which is Mr. Igor Grushko. The agent heard voices inside the house. It was 6 a.m. Igor Grushko's rental car was outside of the home. Accepting all of those facts as true and doing them in the light most favorable to the government. The agents had reason to believe at this time of day with his car out front that he was inside the house. And this, the facts are not unlike Magluta, which in fact, there was a gated community where there were four people on a patio. Two people happened to flee inside, none of which were identified as Mr. Magluta. And so the court found in Magluta that the law enforcement had reason to believe that Magluta was inside because his car was outside and because there were people present at his house and because his lawn was manicured. So she says that if you look at all of the photographs, they knew they had their man, their second man. That's a, that's a factual question, Your Honor. And if she wants to argue that that's clearly all right. I mean, if the, if the photographs, your position, I mean, maybe, maybe you'll say no, but I would take it your position would have to be somewhat different if the photograph or photographs that they had of Mr. Grushko, the Grushko we're talking about here of no identification, were the exact same thing as the gentleman they arrested on the spot that day. I mean, if it matched like 100%, your argument couldn't be the same, right? It would be like, well, how could they not know it was him? They photograph, face, photograph, face, photograph, face, that's you. Right, so the defendants would have a great argument as to clear error. And so. Right, and so my point to you is the question is not whether or not these agents subjectively thought that they couldn't identify or believe that they couldn't identify. It's whether or not the evidence gave them a reasonable basis for that sort of. Well, it's rather whether or not the evidence gave them a reasonable basis to believe he was inside. No, you get that, you get to that if you don't identify him. If you identify him, that issue goes away. If you identify him, that issue goes away. Correct, correct. The agents only think about whether or not he's inside if they fail to identify him at the porch, right? Right. Because if you identify him at the porch, there's no need to worry about whether he's inside. You've already got him outside. Right, and again, I don't believe there was a case cited that says we evaluate that fact of recognition under a de novo standard. The fact was, the fact remains that the agents pulled up to the house, they didn't identify Igor Grishko. That's the fact that we have to accept and view that in the light most favorable of government. Now, it might be. But if they failed, again, and this is a hypothetical, I know that's not this case. But if they failed to identify him because of their negligence, because the photograph that they had of him and the face of the man that they put on the ground were exactly the same, that wouldn't let them go into the house, right? Right. Even if they made a mistake and failed to connect one and one. If the court made a factual finding that the group, the law enforcement test, that agent workman's testimony that he did not recognize Igor, if the court made a factual finding that that was not true. No. In other words. No, I accept that in my hypothetical, the agent is testifying truthfully. In other words, he subjectively did not put one and two together. He didn't realize that the photograph was the man that he had on the ground. But it turns out that the photograph and the booking photo of the man they ultimately arrested were exactly the same. No differences, same haircut, no beard, everything exactly, exactly the same. How do we analyze that? And I know it's a hypothetical. I know it's not this case. But I want to know how we treat the objective photographic evidence in this case in conjunction with the factual findings made by the magistrate judge. The way that we view the objective photographic evidence in this case is that it's just supporting the factual finding. I don't believe that it has anything to do with the question of whether the agent had reason to believe that he was inside. I think there's a two-step analysis here. The first step is let's look at all the facts. And I know that we're accepting under your hypothetical that there were better pictures, in other words. But if the court made the factual finding, even in light of those better pictures, that he didn't recognize Igor, the question is, was that clear error? It's not whether a reasonable officer would have recognized Igor. And so I think that's the distinction. So it's subjective? Correct. I mean, the existence of probable cause to go in or reasonable suspicion to go in is based on a subjective determination? Well, it's based on the circumstances, the factual circumstances that the district court found. Right, but on the Fourth Amendment, don't you always figure out what the officer on the ground believed, thought, et cetera, and then decide whether an objective officer under those circumstances would have done what he or she did? Isn't that the way the Fourth Amendment normally plays out? Right. Right, so his ultimate subjective determination is important and relevant, but I guess the way I would put it is it's not determinative. So if Officer A on the ground believes X based upon what he or she has seen, right, but it turns out that that's just no reasonable officer would have believed that or done that, then the government may have a problem. I see what you're saying now, Your Honor, and I guess that it does tie into whether he had reason to believe he was inside. Right, but the long and the short of it, counsel, is whether there was an objectively reasonable basis to believe the defendant for whom they had a warrant to arrest was inside that house. Is that not clear? That's clear, Your Honor. Let me ask you a slightly different question. Going to the reasonableness here, if one had looked at the wallets of each of the two men outside and had opened it up, would they not have been able to tell that they had both Dennis and Igor? I think that's undeniable, Your Honor, assuming that they had their IDs in their wallets. Well, that's what I'm asking. These men were ultimately arrested. Everything in their pockets was taken out and assessed and listed. Does the evidence in the case show what was in the wallets? The evidence in the case, I believe there was testimony from the Gruszko brothers to the effect of that their wallets were taken out and that both of them always keep their identification in their wallet. Is there any evidence beyond what the Gruszko said? No, not from Agent Workman. Agent Workman testified that after the three to four minutes that it took for them to take them to the ground, get into the house, search the house, after all that was over, one of the agents spoke to the brothers in Russian and the brothers then decided to identify themselves after their house was searched for them. But there's no testimony from any case agent about what was in the wallets. So the only testimony comes from the two defendants. Is that correct? That's correct, Your Honor. Agent Workman testified that he wasn't sure what happened while he was, he wasn't sure what the other agents did. So the only record evidence comes from the defendants and they said our wallets would have established that we were Dennis and Igor. Let's accept that as true. You put on nothing to controvert that. Would it not have been reasonable, obvious and practical for them to just taken the wallets out and looked at it, I mean the agents? Didn't they have the power to do that? No, Your Honor. Especially as to Igor, he was detained for officer safety while the arrest warrants were executed. And so there was no legal justification for the officers having detained him, not arrested him, not placed him in custody. Well, there seems to be some dispute or inconsistency in his testimony, isn't there? Ms. Foldis said, and I take her at her word, that if you look at Workman's testimony, on four occasions, he said one thing, that is to say, essentially this was a custodial arrest. And on two occasions, he said it was a detention. Is that accurate? Yeah, it's accurate that he mixed up the words throughout his testimony, custody and detention. He cleared it up in the end saying that they were detained for officer safety. That's his testimony. And I think it was made clear, it's made clear by the record. Is there a finding by the magistrate judge about whether this was a custodial arrest or a detention? I don't believe there was, Your Honor, in terms of the magistrate judge's credibility assessments. And with the court's indulgence, I'm just quickly skimming. I do not see a finding there that No, Your Honor. Assume with me that it was a custodial arrest for the purpose of my question. And assume further that we accept the statements of Igor and Dennis because they're unchallenged on this record. Why wouldn't it have been the most reasonable thing to simply go into the wallets and establish who they were, or at least who Igor was, even if they knew who the other fellow was, before they went into that house without a warrant to search? So I have two answers to that, Your Honor. The first answer would be that this idea or this question of whether it was a custodial arrest, I believe has to do with the rights of the person that was arrested and not the duty of the officers. And so if they place them under arrest, there's no affirmative duty for them to quickly go through all their stuff and quickly pat them down. Of course, well, would it have been? Let me ask you why it would have been reasonable to go into a house if they could have ascertained simply enough who they were by looking at their wallets and maybe they had a driver's license in it or a health care card or something. Right, so this all happened within the span of three to four minutes. The agents are rushing in there. They're looking for three targets, although two targets, they believe, live at this house. And these are things that happen really fast. And so we can sit here in retrospect and ask what agents should have done in this fast-moving three to four minute process between taking these guys down, one of which they didn't recognize, the other of which was a subject, and then breaching the door when they heard voices on the inside. But the bottom line is that's all reasonable in the scope of the circumstances. And so, again, in the heat of the moment in these fast-moving arrest operations, we can't impose a duty on law enforcement to stop, wait a minute, let's make sure we check the wallets first when they hear voices on the inside and they're not sure they have their target. Did they testify whether the voices they heard on the inside while they were outside sounded like male or female voices? No. That never came out in the hearing? No, Your Honor. The only testimony was that there were voices and noise heard. Did they have a reasonable basis to believe the third defendant mentioned in the arrest warrant, Wozniak, was inside? And if the answer is yes, what would have been the factual basis for that belief? Well, Wozniak was never, they had identified a potential home that he lived in on Miami Beach. They sent a separate crew to execute his arrest warrant on the same day. He was not found in that house. But Wozniak's, the point is Wozniak's address was never actually pinned down. What they knew was that Wozniak used to live in the adjoining house next door, that he moved out somewhere, maybe on Miami Beach, they're not sure. During their surveillance, they see one guy who can't be identified come out. They're not sure if that's a roommate, if that's the Grushkos. And so, given all those facts, there might have been reason to believe that Wozniak, as well, was inside the house. I don't believe, under Payton or Magluta, that gives, that necessarily gives the officers the right to go into the house because there's a question of whether they reasonably believed he lived there to begin with. And so, I think that fact, Your Honor, is not what would lead to affirmance here. I think what would lead to affirmance here is that the district court found that Agent Workman credibly testified that he did not recognize or could not identify Igor, that it was six o'clock in the morning, that Igor's car was outside, that there were voices and noise heard on the inside, that this all happened within the span of three minutes, that they were uncooperative, that they refused to give the code to the house, indicating that, and actually they said they didn't know the code to the house, again, indicating that it wasn't their house or that they weren't the ones that lived there. And so, accepting all those facts, viewing them in the light most favorable to government, I believe that the district court's decision should be affirmed. All right, thank you very much. If it would be okay, I would like to address the Keene issue. Sure. Okay. I just want to back up a little bit because in the transcript, and I would just ask the court to re-look at the sentencing again because on page four of the sentencing transcript, at the very beginning of the sentencing, there is a government concession that there is this two-point enhancement that does not apply. And so they all agree, it doesn't apply and it's going to shift the guideline range down. The original guideline range was 121 to 151, original guideline. When they took away that two-point enhancement, it became 97 to 121. So it was an overlapping guideline range right at the 121 mark. If you fast forward into the latter part of the sentencing where the judge is actually imposing the sentence, he says, I'm going to give you the low end, government's asking for high end, but I'm going to give you the low end, 121 months. So there's a confusion there because he said 121 months, but that's actually the high end of this new guideline range as opposed to the low end. So they go on with the sentencing a little bit and the AUSA then is confused and he asked the judge, you said 121, but you said it was low end, but that's actually the high end. And so the judge says, oh, keep it the same, 121, regardless of that two point enhancement that we all agree doesn't, you know. You're talking about the guidelines without the two year. No, there was a two point enhancement that was originally assessed in the PSI for receiving stolen property at the beginning of the sentencing. No, no, I know, I know. Okay. When you're talking about the 121 and the judge talking about the 140, you're talking before or after the two year consecutive. Without the two year consecutive, just the guideline. We're on the same page. So anyway, so there was this confusion about whether the judge was actually giving high end or low end at the 121. So that's when the AUSA asked for clarification and the judge said, oh, I misspoke. It's 121. Okay, so it's high end as opposed to low end, right? So then right after that, the AUSA then starts to ask the judge to make this keen statement on the record. And the AUSA goes through all, you know, very long kind of predicate for this keen statement. But when you see what the judge answered, he wasn't necessarily adopting everything or even understanding the nuance of what the AUSA was saying. And this is on page 50 of the sentencing transcript. In the middle of the AUSA explaining all this stuff about keen, the court interrupts and says, correct, whether the enhancement was in favor or not, my sentence will remain the same. So if you look at that, the way the court said it, they're talking about one enhancement. They're not talking about any enhancement that could have happened during the whole proceedings. He's referring to a singular enhancement and they had just been talking about whether it was the high end or the low end because of that two point enhancement. Then very quickly thereafter, the court affirms that it's sentencing within the guideline range. It says at the bottom of a page 50 going to 51. He says the sentence will be imposed at the advisory guidelines range. So he's thinking he's got the right guideline range. He's just doing the high end as opposed to the low end. And that's important because under the Barner case, if the court is trying to sentence within the guideline range and that guideline range turns out to be wrong, then that can't be harmless error because the court is putting its reliance on that guideline range. That's what the Barner case says. And the Eason case, which I filed on the 28J yesterday, shows that when a court is saying, yes, I would sentence the same anyways, the court really looks, this court looks very hard at what the court actually said below. And it has to be very specific and explicit about what enhancements they're talking about. So in the Eason case, there was a career offender guideline that the sentencing court thought applied and it didn't think it was appropriate. So it varied downward and said that the sentencing guideline range was not appropriate. On appeal, it was determined that that career offender guideline didn't apply at all. It was just totally improper. And so the government in the Eason case argued this is harmless error. The district court already recognized that the career offender guideline was too much and they varied down. But this court said, no, no, no. The court didn't say specifically that if it knew that the career offender guideline was improper, that it would have given the same sentence. It said it varied downward and was taking into account that it didn't like the career offender guideline, but it didn't say it would give the same sentence if it knew that that career offender guideline was totally improper. So they sent it back so that the court could re-evaluate the whole thing. And the government did file the Proctor case just yesterday, I think it was. And I just want to point out in that case, again, the court was extremely explicit and extremely specific. It said, no matter what errors I make, I would sentence the same. There's a lot of aggravating circumstances. And it said, and if you, I would take every single factor and vary it upward. That's what the Proctor case says. That's not what this court in this case said. It was referring to a two-point enhancement. So I was just, I just asked the court. So help me, just help me. I have the transcript in front of me and I've been looking at it at the point where Mr. Homer asks the court to make a keen finding. Homer says, the prosecutor, I just want to make sure I understand for the record, the government advocated for a high-end sentence based on my calculation at 97 to 121 months. I just want to make sure I understand your honor's sentence at 121 months for the non-aggravated identity theft counts. I think your honor said that that was not a high-end sentence. I just wanted to make sure the record at that point, the court interrupts and says, quote, I misspoke, but still I think the sentence, even what I imposed is sufficient and necessary to impose based on their role and conduct in this case. So I'm maintaining that sentence  Homer, not satisfied that he's got the statement quite clear enough, apparently says, thank you, your honor. I still think by calculation within the guideline range, I would ask your honor, I'm going to make the same request when you sentence Mr. Igor that your honor, given the likelihood of appeal for the variety of reasons, I'm sure your honor has noticed make a finding under United States versus Keene under that case, any error in calculating the guidelines at all is harmless and not subject to any sort of reversal. So long as the district court clearly indicates that it would have imposed the same sentence, regardless of whether the court had decided in the defendant's favor for any sort of sentencing enhancement. So long that the sentence is dash dash, the judge interrupts at that point and says, quote, correct. And this is the critical language I want you to comment about. The court goes on to say, whether the enhancement was in favor or not, my sentence will remain the same. Thank you very much. Homer says the court doesn't matter. Okay, Homer, thank you. All right. The court says the same thing applies with respect to Igor. Homer, thank you. The court then says, that being said, the court has considered the statements of all of the parties, the pre-sentence report, which contains the advisory guidelines, the statutory factors as set forth in 3553A. The sentence will be imposed at the advisory guideline range and will provide sufficient punishment and deterrence. And then there's an additional comment the judge makes later when sentencing Igor. And he says that he's considered the statements of all the parties, basically the same thing. You do not believe that's sufficient under Keene to constitute a clear statement that even if he screwed up and he recognized that he had made a mistake, he said unambiguously, I'd have given the same sentence anyway. Maybe that's not substantively reasonable. That's a different question. But isn't it clear from this colloquy what the trial judge was trying to say? Your Honor, I believe taken in context where they're talking about the overlapping sentencing range. The focus was on whether it was high-end or low-end and the court's response wasn't, yeah, I will take everything into consideration. And in fact, I would do an upward variance if I had to to make sure I got the same sentence. That's what the Proctor case did that the government cited, okay? So it was super clear in Proctor. Here, I think there is a bigger ambiguity. And in the context of the colloquy here, I believe the court is referring to its misspeaking of the guideline ranges because they do overlap. And he originally thought it was low-end where it was high-end. And I think that he's responding as to the enhancement, which again is that critical sentence you were pointing to. He doesn't respond all enhancements. He says the enhancement. So what I am asking your honors to look at is to see whether in the context the court is adopting the whole ball of wax that the prosecutor was putting on the record or whether the court was really saying that enhancement that made it high-end as opposed to low-end is the one I'm talking about. What I really don't see, again, compared to the Proctor case is the court acknowledging that even if this guideline range is completely messed up, you know, it doesn't appear that he's thinking he's got a six-point problem on the loss issue. So, and I don't see the court saying I would even vary upward to make sure that we get the same sentence. And that's the difference between this one and Proctor. So that's the... Thank you very much. All right. Thank you, Ms. Foldis. Thank you. There was no explanation really. The explanation for why someone would vary up to the level that we're talking about, if it was an upward variance, there wasn't really an explanation given by the court as to why that size of a variance would be appropriate. So that's another reason why I think it would not be. I probably should have given Margaret my time because I wanted to address the same issue. I think that I want to go back to what I was arguing originally, the slightly bigger picture, but as it applies in this case, the court should be as part of the articulation of reasons why they're enhancing, they're making an upward variance. They have to come up with reasons that would justify an upward variance because under the situation right now, we have this gap and the court has never justified that gap with anything that would approach or be, if the government asked for it, the government has said, okay, here is the guideline range, which is 51 to 63 months on the non-aggravated identity theft. Now, we want you to sentence him, these defendants to 121 months. What would be the justification that the government would have to present to the court? They didn't. The court, because the court is in essence deciding in advance that it would have given an upward variance, has to say, if it turns out that I'm wrong on the relevant conduct on the amount of loss, these are the factors that I would use to bring it up to 121 months. The court just pronounced that. Basically, there's no basis in the record for the court if this had been requested by the government for the government to justify why the upward variance was made and the mere fact that the court said that he would have imposed the same sentence is inadequate. Thank you. Thank you all very much. We appreciate the help.